# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greg Gold,                :

            Appellant      :

                        :

           v.               :

                        :    No. 1846 C.D. 2015

Butler Area Sewer Authority      :    Submitted: April 12, 2016


BEFORE:    HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE COVEY                        FILED: May 4, 2016


Greg Gold (Gold) appeals from the Butler County Common Pleas Court's (trial court) June 2, 2015 order finding in favor of the Butler Area Sewer Authority (Authority) and against Gold in his employment discrimination/retaliation action against the Authority. There are two issues before the Court: (1) whether the trial court erred in determining that Gold failed to establish a prima facie claim of gender discrimination; and, (2) whether the trial court erred in ruling that Gold failed to meet his burden of proving that the Authority's proffered reason for Gold's employment termination was pretextual. After review, we affirm.


**Background**

The Authority hired Gold as a laborer in 1992. Approximately six months after his initial hire date, the Authority reclassified Gold as maintenance personnel. In 2008, after working as maintenance personnel for approximately fifteen years, Gold began working as a dye tester. Gold was selected for the dye tester position because he was the most senior Authority employee to bid for that

position. Throughout his employment with the Authority, Gold was a member of the American Federation of State, County, and Municipal Employees Union (Union). During his employment with the Authority, Gold was the subject of numerous disciplinary issues. On December 10, 1998, Gold was suspended for inappropriate and unacceptable conduct. On October 27, 2003, Gold was suspended for misuse of Authority property. On January 11, 2007, Gold was suspended, pending employment termination, for testing positive on a random drug test. On January 18, 2007, the Authority entered into a Last Chance Agreement (2007 Agreement) with Gold, whereby, Gold was required to complete a drug rehabilitation program, and was subject to random drug and/or alcohol testing for a period of 60 months following his reinstatement. The 2007 Agreement also provided that Gold's employment could be terminated without any right to file a grievance or to demand arbitration, should he fail a drug and/or alcohol test within said time period and/or within the first 12 months of the 60-month term if he violated any policy, work rule, law, statute or regulation.

On April 16, 2009, the Authority terminated Gold's employment for violation of an Authority work rule related to outside employment and conflict of interest, specifically for replacing sewers outside of his job with the Authority, and for lying to the Manager and Solicitor regarding the same. The Union filed a grievance challenging Gold's employment termination, and on May 27, 2009, Gold and the Authority entered into a second Last Chance Agreement (2009 Agreement). The 2009 Agreement provided that Gold's employment termination was converted to a 30 work day suspension without pay. By signing the 2009 Agreement, Gold acknowledged that he willfully engaged in conduct in violation of the Authority's outside work rule, and that he willfully lied to the Manager and Solicitor. The 2009 Agreement provided that, in the event of any disciplinary infraction whatsoever for performance or behavior, or for any violation of any policy, work rule, directive, law,

2

statute or regulation during the first 60 months following reinstatement, Gold was subject to employment termination without any right to file a grievance or to demand arbitration. The 2009 Agreement also specifically provided that, after he completed the 60-month period, Gold would again be vested with the right to file a grievance relating to any disciplinary action against him, and to demand arbitration.

On June 26, 2012, before the expiration of the 2009 Agreement, Gold and eleven co-workers attended a voluntary cardiopulmonary resuscitation (CPR) training at Butler County Community College (BCCC). Jessica L. Bascom, now Bronder (Bascom), was the CPR instructor. During the class, Gold asked Bascom: "How would you perform CPR on a well-endowed woman, like yourself?" Reproduced Record (R.R.), Gold Ex. 5 (Laderer Statement). Bascom appeared taken aback by the question. After Gold asked his question, a comment was made by another person in the room, which was followed by snickering and laughter. Bascom pointed in the direction of the person who made this comment, and said: "you're not there to grope them." *Id*. Bascom then instructed the class about an alternative CPR method to be used on larger victims, which involves giving compressions on the victim's back. During a break, one or more of the participants apologized to Bascom for Gold's question. Gold did not apologize, as he did not feel his question was inappropriate or offensive. Gold received a CPR certification card at the end of the day's training which listed the instructor's name as Jesse Haas. As Gold was leaving the building, he blew up a latex glove and attached it to the door exiting to the parking lot. Gold did this for no other reason than he was "messing around." Certified Record (C.R.) at 113, Gold Ex. 36 (Gold Interview). Gold's supervisor, Fred Cappuccio (Cappuccio), observed this incident, and told Gold to remove the glove. Gold complied and removed the glove.

Following the CPR training on June 26, 2012, a member of the Authority's management staff who was present at the training, Ronata Lavorini

(Lavorini), informed the Authority's Executive Director Thomas D. Rockovich (Rockovich) of Gold's question and its aftermath. Lavorini told Rockovich that Gold asked Bascom how a person would give CPR "on a distressed female that was well-endowed," and that he referenced the instructor as an example of such a person. C.R. at 110, Gold Ex. 33 (Lavorini Interview). Lavorini indicated that Bascom appeared "somewhat stunned" by the remark. *Id.* Lavorini relayed that "she felt uncomfortable by the incident and embarrassed for the instructor[.]" *Id.* Rockovich drafted a written memorandum regarding Lavorini's account of the CPR training events, but took no disciplinary action at that time. Rockovich planned to speak with the other management level employees who attended the training, the next day. On June 27, 2012, Rockovich spoke with another member of the Authority's management who was present at the training, Kerrie Hay (Hay). Hay told Rockovich that Gold "made an inappropriate remark about the instructor in the form of a question about performing CPR on well-endowed women." C.R. at 111, Gold Ex. 35 (Hay Interview). Hay reported that Bascom was visibly taken aback by the remarks. Rockovich drafted a written memorandum of Hay's statement.

Rockovich also spoke with Cappuccio, another member of the Authority's management staff, who was present at the training and received his account of the June 26, 2012 events. In addition to telling Rockovich about Gold's question, Cappuccio also informed Rockovich of the glove incident. Cappuccio relayed that he considered Gold's actions inappropriate for an Authority employee. The statements of all three individuals, regarding the nature of Gold's question, expressed essentially the same information. On Monday, July 2, 2012, Rockovich spoke with Bascom on the telephone. On July 5, 2012, Gold was called into Rockovich's office, and Rockovich informed Gold and the Union Steward Dennis Kenyon (Kenyon) of the complaint. Rockovich told Gold to make things right by the end of the next day. Gold attempted to locate/contact Bascom by leaving messages at

4

the Butler Fire Department and the Butler Ambulance Service. Gold was unable to contact Bascom, in part because the name listed on the CPR card was Jesse Haas.

On July 6, 2012, Bascom received a telephone call from her other place of employment, Bronder Technical Services (BTS), and was told that Gold called, asking for her husband. Bascom was informed that when Gold called BTS, he asked to speak with Jess McGee's husband. Jess McGee is Bascom's alias on Facebook. Bascom was concerned by Gold's call to BTS and by his attempts to contact her, so she called Rockovich to inform him of the calls. Later that day, at the request of the BCCC Human Resources (HR) Director Linda Dodd (Dodd), Bascom prepared a written account of the events that took place on June 26, 2012 and on July 6, 2012. With respect to the events of June 26, 2012, Bascom recalled Gold stating, "I don't think I would be able to perform CPR on someone if they [sic] were as attractive as you with big breasts." C.R. at 108, Gold Ex. 33 (Bascom Statement). Bascom represented that she was taken aback by this comment, and during the following break in class, several students apologized to her for his comment.

Also on July 6, 2012, Rockovich and Gold had another meeting, during which, Gold informed Rockovich that he had attempted, without success, to contact Bascom. Rockovich told Gold that "[he] wouldn't try to contact" Bascom because she may interpret his attempts in the wrong manner. R.R. at 483. Despite Rockovich's direction, on the following Monday, July 9, 2012, Gold and his co-worker Dan Deal (Deal), went to BCCC to look for Bascom, they did so while in Authority uniforms, driving an Authority vehicle and during their on-duty work hours. These actions violated Authority policy. Deal stayed in the vehicle while Gold went inside. Gold was escorted by a security guard to the HR office, where he met with Dodd. Gold informed Dodd that he was trying to contact Bascom, but he did not inform Dodd of the reasons for doing so. Dodd informed Gold that they do not give out contact information.

Later that day, Rockovich and Gold met again at which time Rockovich placed Gold on paid suspension. Gold was accompanied by Kenyon at this meeting. Following Gold's July 9, 2012 suspension, Rockovich reviewed Gold's records and personnel file. On July 12, 2012, Gold hired outside counsel who filed an administrative complaint with the Equal Employment Opportunity Commission (EEOC) and the Pennsylvania Human Relations Commission (PHRC) complaining of gender discrimination, harassment, hostile work environment, retaliation and wrongful suspension. In the complaint, Gold alleged that he was subject to gender discrimination because a female employee filed a complaint of sexual harassment against him based upon his question at the June 26, 2012 CPR training. Gold alleged that the complaint of sexual harassment was merely a pretext for gender discrimination and wrongful suspension.

Rockovich received Gold's complaint on July 12, 2012. On July 24, 2012, Rockovich sent Gold a Notice of Charges and Loudermill Hearing,[1] confirming the July 9, 2012 paid suspension and outlining the charges against Gold. Despite the 2009 Agreement's provisions, whereby Gold waived his right to grieve and arbitrate any disciplinary action, Rockovich provided Gold with a notice of charges against him and an opportunity to respond to said charges, prior to taking action against him in the nature of either a suspension without pay or an employment termination.

The Notice of Charges listed five actions for which Gold was being charged, essentially: (1) referring to Bascom as attractive with big breasts; (2) blowing up a rubber glove and hanging it on the outside of a building on the college campus; (3) attempting to contact Bascom at her place of employment and her

---

[1] In *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), the Supreme Court held that since a public employee has a property interest in his employment, under the United States Constitution's Due Process Clause, the employee must be afforded at least notice and a hearing before that employment is terminated.

residence; (4) traveling to the college campus during work hours, using a work vehicle, and attempting to contact the instructor; and (5) falsely telling Dodd that he was directed to apologize to the instructor. Prior to the Loudermill hearing, the Union did not request, nor did Rockovich provide, a copy of Lavorini's or Hay's statements.

A Loudermill hearing was held on July 31, 2012. After the Loudermill hearing, the Union requested, and the Authority agreed to allow, additional time for the Union to gather witness statements. On August 2, 2012, Robert Vormack, Richard DiBiase (DiBiase), and Steve Laderer each presented the Union with written statements. On August 3, 2012, Deal, Ricky Price, and Bruce Groom gave the Union their written statements. Rockovich received the statements before August 10, 2012. The above witnesses confirmed that Gold personalized his question, and referenced the instructor as being well-endowed. At some point between July 9, and August 10, 2012, Deal and DiBiase approached Rockovich to inform him that Gold did not use the phrase attractive with big breasts.

On August 10, 2012, Rockovich sent Gold a Notice of Employment Termination (Notice). C.R. at 141-143, Authority Ex. D. The Notice advised Gold his employment was being terminated because: (1) Gold "did not conduct [himself] in an appropriate manner while participating in the voluntary [CPR] training[;]" (2) Gold's remark to the instructor, regardless of whether he referred to her as "attractive . . . with big breasts" or used the phrase "well-endowed woman, such as yourself," was inappropriate and offensive "because [he] personalized" the question by referencing that particular instructor's physical attributes; (3) "the remark/question shocked the instructor[;]" (4) Gold "should have realized that asking [this] question in the manner that [he did] . . . would have placed a female instructor in an uncomfortable position[;]" (5) the incident violated the Authority's harassment policy "whether or not [Gold] realized the ultimate consequences of [his]

7

remark/question[;]" (6) Gold did not attempt to apologize for the remark "within a reasonable timeframe," as other Authority employees did; (7) Gold treated the incident casually, "from the time of [his] remark . . . to the glove-inflating event[,]" which demonstrated "a continued cavalier and immature attitude" and improper behavior "within an employment setting[;]" (8) on July 9, 2012, during his on-duty working hours, "Gold traveled to the [BCCC] campus" in an Authority vehicle "and attempted to contact the instructor" and/or obtain her contact information; and (9) on July 9, 2012, Gold was asked by the BCCC HR Director if he was there on work time, and he advised her that he was, but "that the Executive Director had directed [him] to apologize to the instructor[,] [which] was false." *Id.*

The Notice further advised Gold that while working for the Authority he has demonstrated an inability to exercise proper discretion and acceptable behavior. The Notice referenced Gold's nine separate disciplinary incidents since 1998, and referenced the 2009 Agreement. It concluded that Gold's behavior at the June 26, 2012 CPR training and in subsequent related events, provided just cause to warrant disciplinary action for inappropriate behavior and policy violation.

On August 14, 2012, Gold filed a second complaint with the EEOC and PHRC claiming he was fired in retaliation for filing his July 12, 2012 claim. Gold did not identify anyone within the Authority who was subject to a second Last Chance Agreement and/or was in a similar factual situation as himself.

**Facts**

On September 23, 2013, Gold filed a complaint with the trial court against the Authority alleging in Count I, Unlawful Suspension under the Pennsylvania Human Relations Act (PHRA)[2] - Gender Discrimination/Hostile Work

---

[2] Act of October 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

8

Environment. In Count II, Gold averred Wrongful Termination under the PHRA - Retaliation for Protected Activity and Gender. On November 18, 2013, the Authority filed Preliminary Objections to Gold's complaint. The Preliminary Objections were resolved by agreement of the parties, i.e., Gold agreed to withdraw the allegations concerning a 2009 continuing violation, thereby voiding his hostile work environment claim. The trial court held a non-jury trial on May 14 and 15, 2015. On June 2, 2015, the trial court found in favor of the Authority and against Gold on both counts of Gold's complaint. Gold did not file post-trial motions. On June 19, 2015, Gold filed an appeal with the Superior Court. On June 23, 2015, the trial court filed an order directing Gold to file a 1925(b) statement of matters complained of on appeal (1925(b) Statement). Gold filed his 1925(b) Statement on July 7, 2015. On August 5, 2015, the Superior Court transferred the appeal to this Court.[3] On August 25, 2015, the trial court filed a 1925(a) memorandum adopting its June 2, 2015 decision as its 1925(a) opinion. Judgment was entered in the Authority's favor on October 7, 2015.

## Discussion

Before reaching the merits of the case, we must determine if Gold has preserved any issues for appeal. Pennsylvania Rule of Civil Procedure 227.1(c) provides: "Post-trial motions **shall be filed** within ten days after (1) verdict, discharge of the jury because of inability to agree, or nonsuit in the case of a jury trial; or (2) notice of nonsuit or the filing of the decision in the case of a trial without jury." Pa.R.C.P. No. 227.1(c) (emphasis added). Gold did not file post-trial motions.

---

[3] "Our standard of review of a non-jury trial is to determine whether the findings of the trial court are supported by competent evidence, and whether an error of law was committed." *Metropolitan Edison Co. v. City of Reading,* 125 A.3d 499, 501 n.3 (Pa. Cmwlth. 2015) (quoting *Swift v. Dep't of Transp.,* 937 A.2d 1162, 1167 n.5 (Pa. Cmwlth. 2007)).

> Even though neither party has raised the issue of whether this [C]ourt has jurisdiction to consider [Gold's] appeal when [he] failed to preserve any issues for review by not filing post-trial motions pursuant to Pa.R.C.P. [No.] 227.1, the question of appealability implicates the jurisdiction of this [C]ourt - a non-waivable matter - so that the failure of the parties to raise the issue does not prevent this [C]ourt from doing so *sua sponte.*

*Borough of Harvey's Lake v. Heck,* 719 A.2d 378, 380 n.4 (Pa. Cmwlth. 1998). We acknowledge that Gold filed a 1925(b) Statement. "However, waiver due to failure to file post-trial motions will not be remedied by listing those issues in a Rule 1925(b) [S]tatement." *The Ridings at Whitman's Homeowners Ass'n v. Schiller,* 811 A.2d 1111, 1114 n.4 (Pa. Cmwlth. 2002).

The Pennsylvania Supreme Court has stated: "Under [Pa.R.C.P. No.] 227.1, a party **must file post-trial motions** at the conclusion of a trial in *any* type of action in order **to preserve claims** that **the party wishes to raise on appeal**." *Chalkey v. Roush,* 805 A.2d 491, 496 (Pa. 2002) (bolded emphasis added). Our Supreme Court has further held: "If an issue has not been raised in a post-trial motion, it is waived for appeal purposes." *L.B. Foster Co. v. Lane Enters., Inc.,* 710 A.2d 55, 55 (Pa. 1998). Moreover, this Court has consistently ruled: "Where a party fails to file timely post-trial motions after a bench trial, no issues are preserved for this Court to review." *Liparota v. State Workmen's Ins. Fund,* 722 A.2d 253, 256 (Pa. Cmwlth. 1999); *see also P.S. Hysong v. Lewicki,* 931 A.2d 63, 67 (Pa. Cmwlth. 2007) (There is "overwhelming authority that the failure of an appellant to file post-trial motions in a proceeding to which [Pa.R.C.P. No.] 227.1 applies results in a waiver of issues[.]"); *Schiller,* 811 A.2d at 1116 ("[The appellants] failed to file post-trial motions thus waiving their issues on appeal[.]"); *Heck,* 719 A.2d at 380 ("A party's failure to file post-trial motions results in a waiver of all issues for appellate review and requires that the appeal be dismissed."). "Consequently, when [Gold]

10

failed to file post-trial motions within ten days following the trial court's order, the issues [he] sought to raise in [his] concise statement of errors complained of on appeal were waived." *City of Phila. v. New Life Evangelistic Church,* 114 A.3d 472, 478-79 (Pa. Cmwlth. 2015).[4]

        For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[4] This Court has reviewed the trial court's decision and discerns no error in its reasoning.

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Greg Gold,                  :
            Appellant     :
                             :
           v.                :
                             :    No. 1846 C.D. 2015
Butler Area Sewer Authority      :

## O R D E R

AND NOW, this 4th day of May, 2016, the Butler County Common Pleas Court's June 2, 2015 order is affirmed.

_____
ANNE E. COVEY, Judge